UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
:
EDWARD POLLNER,                                    :   Case No. 1:22-cv-5623
:
Plaintiff,           :
:
v.                                                 :   **COMPLAINT**
:
TRI-STATE TOURNAMENTS, LLC,                        :   JURY TRIAL DEMANDED
:
Defendant.           :
::
---------------------------------------------------------------x

Plaintiff Edward Pollner ("Mr. Pollner") by his attorneys K&L Gates LLP, for his complaint against Defendant Tri-State Tournaments, LLC ("Tri-State," and together with Mr. Pollner, the "Parties"), alleges as follows:

## NATURE OF THE ACTION

1. This action concerns a straightforward dispute over the rightful owner of a cash prize at a fishing tournament. Mr. Pollner's team, Ragnar, caught a 195.6 pound bigeye tuna and was entitled to a $199,880 cash prize, making him one of the top three cash prize winners. Pursuant to tournament rules, the captain of Ragnar, Rudolf Bonicelli, and Mr. Pollner both took polygraph examinations on the final night of the tournament. Both Mr. Pollner and Mr. Bonicelli had consumed alcohol provided by Tri-State at the post-tournament ceremony, and Mr. Bonicelli informed the polygraph examiner that he had not slept the night before. Despite the fact that their alcohol consumption and Mr. Bonicelli's fatigue made them unsuitable examinees under widely accepted polygraph standards, Tri-State proceeded with the polygraphs. Mr. Bonicelli was offered the opportunity to take a second examination the following morning, but he remained fatigued due to the stress of the prior night's polygraph results and was therefore still unsuitable for examination. The examiner nonetheless conducted an inexplicably truncated re-examination and

reported to Tri-State that Mr. Bonicelli had failed it. Mr. Bonicelli and Mr. Pollner subsequently passed polygraphs administered by a reputable agency.

2.  Due to its clearly flawed polygraph examinations, Tri-State has refused to release the cash prize winnings to Mr. Pollner. Mr. Pollner therefore brings this action to claim his rightful winnings.

## PARTIES

3.  Plaintiff Edward Pollner is a Florida resident with his residence at 214 W Rivo Alto Dr., Miami Beach, Florida 33139. Mr. Pollner is a commercial tuna fisherman. In his spare time, Mr. Pollner enters multiple big game fishing tournaments a year and is well-known in the small, tight-knit community of people who participate in such tournaments. Mr. Pollner regularly enters big money fishing tournaments along the East Coast and is a regular annual participant in the Tri-State Canyon Shootout (the "Tournament"), and he and Rudolf Bonicelli are well known to the Tournament organizers and most of the Tournament participants. Mr. Pollner's winnings in these tournaments exceed $500,000.

4.  Upon information and belief, Defendant Tri-State Tournaments, LLC is a Connecticut limited liability corporation with its principal place of business located at 25 Smith Avenue, Niantic, CT 06357.

5.  Upon information and belief, Tri-State has two members: Kerry Douton and Kyle Douton.

6.  Upon information and belief, Kerry Douton is a Connecticut resident and resides at 35 Attawan Avenue, Niantic, CT 06357.

7.  Upon information and belief, Kyle Douton is a Connecticut resident and resides at 5 Rockwell Street, Niantic, CT 06357.

## JURISDICTION AND VENUE

8. This Court has personal jurisdiction over Defendant Tri-State because it conducts business within the Eastern District of New York. Specifically, it conducts the Tournament to attract and involve as many fishing boats as it can, focusing on the "Tri-State" region of New York, Connecticut, and Rhode Island. Many of the participating boats hail from New York ports on eastern Long Island. Mr. Pollner is a summer resident of Montauk, New York. His vessel, Ragnar, registers Montauk as its home port and is licensed to fish commercially in New York. Mr Bonicelli, the captain of Ragnar, is a full-time resident of the State of New York. Mr. Pollner registered for the Tournament and paid the entry fee in the State of New York. He also entered calcuttas (optional betting pools in which entrants can bet on the outcome of the tournament), including the calcutta titled Homeport-Montauk, in the State of New York.

9. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because (i) the amount in controversy exceeds $75,000, and (ii) the Parties are diverse. Specifically, Plaintiff is a resident of Florida, and Defendant is a Connecticut limited liability company with two members, both of whom reside in Connecticut.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A.     The Tri-State Canyon Shootout**

11. The Tournament is a multi-day fishing tournament operated by Tri-State. Entrants compete to catch the largest fish in a number of categories, including wahoo, mahi mahi, and various species of tuna.

3

12. While entrants can win cash prizes directly from Tri-State, participants can also enter calcuttas to bet on the outcome of the tournament. Upon information and belief, Tri-State organizes the calcuttas and collects a vig from participants.

13. Participating in the Tournament is a costly endeavor. Mr. Pollner paid a $2,800 entry fee and spent nearly $5,000 on fuel and dockage alone. He also paid $14,600 to enter various Tournament calcuttas. In total, Mr. Pollner estimates that he spent $19,000 on Tournament-related costs.

14. The 2022 Tournament took place from July 24-28, 2022.

15. Mr. Pollner registered for the Tournament on July 20, 2022. He listed himself as a resident of Miami, Florida and stated that his vessel, Ragnar, is based in Montauk, New York. As the registrant, Mr. Pollner was entitled to receive cash prizes, if any.

16. In registering for the Tournament, Mr. Pollner agreed to abide by the 2022 Tri-State Canyon Shootout Rules (the "Rules").

17. The Rules provide, among other things, that a mandatory polygraph test be given to the top three cash prize winners of the Tournament.

18. The Rules further provide that the captain of the winning vessel must take the polygraph, but in the event that the captain is deemed unable to take the polygraph for any reason, the Tournament Directors can choose another member of the registered crew to take the polygraph instead.

19. The Rules also state that polygraphs must be administered on the final day of the Tournament but provide that "Any boat required to take a polygraph test in accordance with the rules of the Tri-State Canyon Shootout but is unable to complete the polygraph test during the polygraph testing immediately following the conclusion of weigh-in on Day 4 for the tournament

4

is required to make arrangements to complete polygraph testing at Truth Detection Labs in Massachusetts. Failure to complete the polygraph within 7 days of the conclusion of the tournament will result in disqualification."

**B.     Mr. Pollner and His Crew Participate in the Tournament**

20. Mr. Pollner and the Ragnar crew participated in the Tournament and fished on July 27 and 28, 2022. On July 28, they caught a 195.6 pound bigeye tuna.

21. The tuna was large enough that Mr. Pollner placed fourth in the Tournament for the largest tuna.

22. Due to entries Mr. Pollner had placed in the calcuttas, Mr. Pollner was entitled to a $199,880 cash prize, making him one of the top three cash prize winners.

23. Following the Tournament's conclusion, Tri-State held a ceremony to announce and celebrate the winners on the evening of July 28, 2022.

24. At this ceremony, Tri-State served free alcoholic drinks to attendees, and both Mr. Pollner and Rudolf Bonicelli, the captain of Ragnar, drank alcohol.

**C.     Tri-State Administers Flawed Polygraphs**

25. Because Ragnar was one of the top three cash prize winners, Tournament Rules required that Mr. Bonicelli be polygraphed unless he was deemed unable to take the polygraph.

26. Kenneth J. Mitchell, a Senior Examiner at Truth Detection Laboratories, administered the polygraph. Both Mr. Mitchell and Truth Detection Laboratories list themselves as members of the American Polygraph Association ("APA") and are accordingly governed by the APA's standards.

27. The APA imposes continuing education requirements on its members but indicates that Mr. Mitchell has not reported compliance with such requirements in over twelve years,

28. The APA adopted a Standards of Practice ("APA Standards") and Model Policy for Examinee Suitability ("Suitability Policy").

29. Paragraph 1.2.3 of the APA Standards advises "The examiner should make reasonable efforts to determine if the examinee is a suitable candidate for polygraph testing."

30. Paragraph 5 of the Suitability Policy states that "Examiners should not conduct polygraph examination on individuals determined to be unsuitable." Paragraph 5.6 of the Suitability Policy further advises that "Observable impairment due to the influence of prescribed or non-prescribed controlled substances including alcohol" is a condition that "should preclude and examinee from suitability for polygraph testing."

31. The APA also recommends that examinees have a minimum of 6-8 hours of sleep to avoid exam anomalies caused by fatigue.

32. The Global Polygraph Network, another leading industry association, specifically advises that it "strongly discourage[s] the administration of any polygraph exams on a fishing day since testing is less reliable when a person is fatigued."

33. Paragraph 1.7.8 of the APA Standards also provide that "An audio and video recording of all phases of the exam shall be maintained as part of the examination files, consistent with agency policy, regulation or law, for a minimum of one year."

34. Mr. Bonicelli's polygraph began in the evening of July 28. During the pre-test portion of the exam, Mr. Mitchell asked Mr. Bonicelli how many hours of sleep he had had the night before, and Mr. Bonicelli stated that he had not slept for the past 24 hours.

35. Mr. Mitchell did not ask Mr. Bonicelli if he had been drinking beforehand despite that question's relevance to determining if Mr. Bonicelli was a suitable candidate for examination.

36. Tri-State was aware that Mr. Bonicelli had been drinking because Mr. Kyle Douton advised Mr. Bonicelli to stop drinking in advance of his polygraph. Mr. Douton only told Mr. Bonicelli this after he had already consumed alcohol provided by Tri-State at the post-tournament ceremony. Until that time, Mr. Bonicelli was unaware that alcohol consumption could have an impact on his polygraph results.

37. During the examination, Mr. Mitchell asked a number of questions, including whether (1) Mr. Bonicelli had witnessed or become aware of any infractions of tournament rules, (2) Ragnar followed tournament rules concerning tackle specifications, and (3) Ragnar violated any rules or regulations in regards to the winning fish. The examination lasted less than one hour.

38. Per Mr. Mitchell's report, Mr. Bonicelli's response to those questions indicated deception. Mr. Bonicelli, however, recalls that Mr. Mitchell had told both Kyle Douton and Kerry Douton that there was a question as to whether he had failed.

39. Tri-State then had Mr. Pollner take a polygraph examination in Mr. Bonicelli's stead that same evening. Mr. Kyle Douton stated that the reason Tri-State had Mr. Pollner take a polygraph was because of Mr. Bonicelli's inability to do so due to a lack of sleep.

40. Despite the fact that Mr. Pollner was visibly inebriated, Mr. Mitchell conducted the examination without even asking him whether he had consumed any alcohol. He asked Mr. Pollner the same substantive questions that had been posed to Mr. Bonicelli. This examination was also less than one hour.

41. Despite the fact that the Rules contemplated that competitors may be unable to take polygraphs immediately after the Tournament and provided that they may instead "make arrangements to complete polygraph testing at Truth Detection Labs in Massachusetts" within

seven days of the Tournament, the Doutons did not propose this as an option. Instead, they required Mr. Bonicelli and Mr. Pollner to take the tests on July 28.

42. Per Mr. Mitchell's report, Mr. Pollner's examination was inconclusive, but Mr. Pollner was told after the examination that he had failed.

43. Mr. Pollner was offered the opportunity to take another test the following morning but because he was wrongly told that he had failed the prior examination, he did not appear for the re-examination, and Mr. Bonicelli was re-tested the following morning instead. It was Mr. Bonicelli's understanding that the Doutons wanted him to retake the test, not Mr. Pollner.

44. Prior to Mr. Bonicelli's second examination on the morning of July 29, the Doutons had a lengthy conversation with Mr. Pollner's counsel and Mr. Bonicelli. The Doutons again noted that Mr. Bonicelli's lack of sleep might have affected his test results from the prior evening. In response, Mr. Bonicelli stated that he had only had 4-5 hours of sleep the night before (i.e., the night of July 28) due to the strain of the initial test results. Tri-State again did not propose that Mr. Bonicelli complete polygraph testing at Truth Detection Labs in Massachusetts sometime during the following week when he was better rested.

45. Mr. Bonicelli also expressed concern regarding the breadth of questions regarding the Tournament Rules. In response, Kyle Douton stated that he had taken care to identify the specific rules that concerned him and had discussed those rules with the examiner.

46. Mr. Pollner's counsel also noted that Mr. Bonicelli was extremely anxious about the potential impact on his reputation and that his anxiety could interfere with the test results. Kyle Douton assured Mr. Bonicelli that while exams typically took approximately one hour to complete, Mr. Mitchell would take additional time to ensure that proper baselines were established.

47. Mr. Bonicelli then met with Mr. Mitchell for his re-examination. During the pre-test portion, Mr. Mitchell asked Mr. Bonicelli how much sleep he had gotten, and Mr. Bonicelli responded "4-5 hours." As Mr. Mitchell was aware, Mr. Bonicelli had not gotten any sleep whatsoever the prior night, meaning that he had gotten 4-5 total hours of sleep in at least the past 36 hours. Despite this, Mr. Mitchell proceeded with the examination.

48. The July 29 examination lasted 20-30 minutes before Mr. Mitchell abruptly terminated it. Despite the fact that Kyle Douton had assured Mr. Bonicelli that Mr. Mitchell would take additional time to establish proper, accurate baselines, Mr. Bonicelli's examination was shorter than a typical one.

49. Further, despite the fact that Mr. Douton had assured Mr. Bonicelli that Mr. Mitchell would limit the breadth of his questions and focus on specific rules, Mr. Mitchell again asked Mr. Bonicelli the same broad questions he had raised during Mr. Bonicelli's first examination.

**D.     The Parties' Communications Post-Tournament**

50. On July 30, 2022, Mr. Pollner filed an official protest on behalf of himself and the Ragnar crew by sending a letter to Tri-State in which he detailed the deficiencies of the prior polygraphs.

51. Tri-State sent a letter to Mr. Pollner dated August 9, 2022, advising Mr. Pollner that Mr. Mitchell's report regarding Mr. Bonicelli's examinations indicated deception. The letter did not address Mr. Pollner's test results.

52. The letter further advised that "the prize money in the amount of $199,880.00 will be held in the custody of Ted Harris, Esq. until the matter is resolved by Agreement or court order."

53. The letter invited Mr. Pollner to "please bring forward to Ted Harris your reasons for protesting the Polygraph results of the 2022 Tri-State Canyon Shootout and any claims to the re-appropriated prize money."

54. The cover email to Mr. Harris's letter further advised that "The next party inline will be notified, and tested."

55. Mr. Pollner's counsel informed Mr. Harris that they intended to raise multiple deficiencies regarding the polygraph examinations and asked him to maintain the status quo and avoid notifying other parties of the disputed polygraphs. Mr. Harris declined to do so and instead stated that he was informing the next party in line as a precaution.

56. Mr. Pollner's counsel responded to Mr. Harris by letter dated August 19, 2022 and raised a number of deficiencies with the polygraph examinations, including Mr. Bonicelli's unsuitability as an examinee due to fatigue and alcohol consumption, Mr. Pollner's unsuitability as an examinee due to alcohol consumption, Mr. Mitchell's failure to comply with best practices for polygraph examinations under guidelines promulgated by the APA, Mr. Mitchell's failure to follow the parameters for Mr. Bonicelli's re-examination set by Kyle Douton, and Mr. Mitchell's apparent failure to comply with the APA's continuing education requirement.

57. In addition, the August 19 letter advised Mr. Harris that both Mr. Pollner and Mr. Bonicelli had taken and passed additional polygraphs administered by Lisa J. Ribacoff, a polygraph examiner with In Depth Polygraphs and a director of the APA. Copies of the test results received from Ms. Ribacoff were included with the letter. The August 19 letter further noted Ms. Ribacoff requested copies of Mr. Mitchell's notes, charts, and recordings.

58. On September 2, 2022, Mr. Pollner's counsel sent Mr. Harris a report prepared by Ms. Ribacoff, in which she concluded that the polygraph examinations conducted by Mr. Mitchell

failed to comply with APA standards and should not have been administered to Mr. Bonicelli or Mr. Pollner in their respective conditions.  Ms. Ribacoff again requested that she be provided with the audio and video recordings from all three polygraph examinations and Mr. Mitchell's notes.

59. On September 9, 2022, Mr. Harris responded that he had sent Ms. Ribacoff's report to his "expert for review."  He subsequently confirmed that the expert he was referring to was Mr. Mitchell, the polygraph examiner who conducted the examinations of Mr. Pollner and Mr. Bonicelli following the Tournament in July.  Mr. Pollner's counsel responded that it would be more appropriate to submit the dispute to a neutral third party, but Mr. Harris did not respond to that point.  Despite multiple requests, Mr. Harris still has not provided the audio and video recordings from the prior polygraph examinations or copies of Mr. Mitchell's notes from those examinations.

60. Despite the parties' communications, Tri-State has refused to release the cash prize to Mr. Pollner and removed Ragnar from the Tournament website's listing of the largest money winners.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

61. Mr. Pollner hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

62. Mr. Pollner and Tri-State entered into a valid and enforceable contract when Mr. Pollner registered for the Tournament and agreed to abide by the Rules.

63. Ragnar, Mr. Pollner's vessel, caught a 195.6 pound bigeye tuna and placed fourth in that category.  Due to bets Mr. Pollner had placed in the calcuttas, Mr. Pollner was entitled to a $199,880 cash prize, making him one of the top three cash prize winners.

11

64. The Rules require that all of the top three cash prize winners be given a mandatory polygraph examination.

65. Mr. Pollner and Mr. Bonicelli both were given polygraph examinations despite being unsuitable candidates due to fatigue and alcohol consumption.

66. By requiring Mr. Pollner and Mr. Bonicelli to submit to polygraph examinations at a time when Tri-State knew or should have known that they were unsuitable examinees, Tri-State breached the Rules.

67. As a result of Tri-State's breach, Mr. Pollner was deprived of his contractual right to prize money in the amount of $199,880.00.

## SECOND CAUSE OF ACTION
### Breach of Implied Covenant of Good Faith and Fair Dealing

68. Mr. Pollner hereby realleges and incorporates by reference the allegations contained in the foregoing paragraphs as if fully set forth herein.

69. The Tournament is a high-end fishing tournament. In exchange for agreeing to abide by the Rules, participants expend thousands of dollars during the course of competition.

70. Implicit in the Rules is an implied covenant of good faith and fair dealing in the course of performance. The implied covenant encompasses an obligation on the part of Tri-State to ensure that mandatory polygraph examinations are conducted by qualified professionals in accordance with widely accepted professional standards.

71. Tri-State hired Kenneth Mitchell to conduct the polygraph examinations despite the fact that Mr. Mitchell had failed to report compliance with the APA's continuing education requirements for over 12 years.

72. Further, Mr. Mitchell repeatedly failed to abide by APA guidelines by conducting examinations of both Mr. Bonicelli and Mr. Pollner despite the fact that they were unsuitable candidates due to their alcohol consumption and Mr. Bonicelli's fatigue.

73. Moreover, Mr. Bonicelli's re-examination lasted only 20-30 minutes, considerably shorter than the recommended length of a typical polygraph examination, and Mr. Mitchell asked broad, unfocused questions despite the fact that Mr. Bonicelli had been assured by the Doutons that his questions would be narrow and targeted.

74. By mandating polygraph examinations for all top three prize winners and then relying on substandard polygraph tests of unsuitable examinees administered by an examiner who lacked the requisite credentials, Tri-State has breached the implied covenant of good faith and fair dealing.

75. As a result of this breach, Mr. Pollner was deprived of his right to prize money in the amount of $199,880.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

a. Awarding Edward Pollner damages in the amount of $199,880.00, with statutory pre- and post-judgment interest thereon;

b. Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
September 20, 2022

                                          By: /s/ Priya Chadha
                                               Priya Chadha
                                               K&L Gates LLP
                                               599 Lexington Avenue
                                               New York, New York 10022
                                               Telephone: (212) 536-3900

                                               *Attorneys for Plaintiff Edward Pollner*

.